J-S02034-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: R.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.J., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2420 EDA 2023 |

Appeal from the Order Entered August 23, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000472-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: R.M.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.J., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2421 EDA 2023 |

Appeal from the Decree Entered August 23, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000202-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: D.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.J., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2422 EDA 2023 |

Appeal from the Order Entered August 23, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000580-2021

J-S02034-24

| IN THE INTEREST OF: D.W.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.J., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2423 EDA 2023 |

Appeal from the Decree Entered August 23, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000203-2023

BEFORE:   LAZARUS, P.J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:             **FILED MARCH 15, 2024**

E.J. ("Mother"), appeals from the August 23, 2023 decrees involuntarily terminating her parental rights to her twin daughters, R.H. a/k/a R.M.H. and D.H. a/k/a D.W.H., born in March 2021 (collectively, "the Children").[1] Mother also appeals from the orders changing the Children's respective permanency goals from reunification to adoption. Mother's appointed counsel, Gary Server, Esquire, has filed a petition to withdraw and an accompanying brief, pursuant to **Anders v. California**, 386 U.S. 738 (1967), and **Commonwealth v. Santiago**, 602 Pa. 159, 978 A.2d 349 (2009). After

---

[*] Former Justice specially assigned to the Superior Court.

[1] By separate decrees dated and entered June 20, 2023, the trial court involuntarily terminated the parental rights of any unknown father. Further, by separate decrees dated and entered August 23, 2023, the trial court involuntarily terminated the parental rights of Children's father, A.M. Neither A.M. nor any unknown father filed notices of appeal or participated in the instant appeals.

- 2 -

review, we grant Attorney Server's petition to withdraw, affirm the termination decrees, and dismiss Mother's appeals from the goal change orders as moot.

According to the certified record, the Philadelphia Department of Human Services ("DHS") received a referral in March 2021 concerning, *inter alia*, Mother and the Children testing positive for illegal substances at the Children's birth. Specifically, the Community Umbrella Agency ("CUA") case manager assigned to this case, Omar Burgos, testified regarding the inception of this matter, as follows:

> So, back in March of 2021, a GPS report came in stating that both children, [R.H.] and [D.H.] were found to be born positive, with marijuana and Suboxone[2] in their system. There was also a report that [M]other was unemployed at the time, that she was in an active domestic violent relationship with the [C]hildren's father, and that she had a history of depression.

Notes of Testimony ("N.T."), 6/20/23, at 9. Following their birth, the Children, who were prematurely born at 29 weeks gestation, were hospitalized in the neonatal intensive care unit. Petitions for Involuntary Termination of Parental Rights, 5/25/23, Exhibit "A," Statement of Facts, at ¶ a.

---

[2] Mother acknowledged an addiction to Percocet, following the birth of her oldest child in 2007, for which she had a prescription for Suboxone. She however failed to provide DHS with a valid prescription. Petitions for Involuntary Termination of Parental Rights, 5/25/23, Exhibit "A," Statement of Facts, at ¶¶ b, c.

Upon discharge from the hospital, DHS obtained protective custody of R.H. on May 5, 2021,[3] and the court adjudicated her dependent on May 25, 2021. DHS then obtained protective custody of D.H. on June 8, 2021, and the court adjudicated her dependent on July 19, 2021. The Children were placed together in a medical foster home, where they have remained throughout these proceedings.[4] *See* N.T., 6/20/23, at 9-10. The court confirmed this placement, established respective permanency goals of reunification, and, *inter alia*, ordered Mother to participate in supervised visitations.

In furtherance of reunification, DHS and/or CUA established single case plans, the objectives of which were discussed with Mother and remained consistent. Corresponding to the terms set forth by the court at the time of adjudication, Mother was required to address, *inter alia*, her substance abuse, housing, employment, and domestic violence. *See id.* at 12-13.

Throughout the ensuing dependency proceedings, the court conducted regular review hearings at which it maintained the Children's commitment and placement. The court characterized Mother's compliance with the permanency

_____

[3] R.H. was ultimately discharged from the hospital on May 7, 2021. Petitions for Involuntary Termination of Parental Rights, 5/25/23, Exhibit "A," Statement of Facts, at ¶ n.

[4] The nature of the Children's medical issues is unspecified. Although engaged in early intervention services, these were completed at the time of the June 2023 hearing. *See* N.T., 6/20/23, at 29.

plan and progress towards alleviating the circumstances which necessitated placement as moderate during 2022. However, at a permanency review hearing on January 3, 2023, the court characterized Mother's compliance and progress as minimal. Her progress remained rated as minimal at the next permanency review hearing on March 21, 2023.

On May 25, 2023, the Agency filed separate petitions to involuntary terminate Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (4), (5), (8), and (b), as well as petitions to change the Children's permanency goals to adoption. The court held a combined hearing on the petitions on June 20, 2023. Mother was present and represented by Attorney Server. The Children, who were then two years old, were represented by Adrienne Box, Esquire, of the Defender Association of Philadelphia Child Advocacy Unit.[5]

---

[5] The Defender Association of Philadelphia, Child Advocacy Unit, was appointed as guardian *ad litem*/counsel for the Children at the outset of the dependency proceedings. Insomuch as the Children's legal interests were incapable of ascertainment due to their young age, we find section 2313(a) satisfied by the representation of Attorney Box. *See In re T.S.*, 648 Pa. 236, 257, 192 A.3d 1080, 1092-1093 (2018) (holding, "if the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests; as such, the mandate of section 2313(a) of the Adoption Act" is satisfied.).

At the conclusion of the subject hearing, Attorney Box argued in favor of a goal change to adoption and termination of Mother's parental rights. *See* N.T., 8/23/23, at 10-11. Given the filing of an *Anders* brief, the Defender Association submitted a letter to this Court indicating that no brief would be filed on behalf of the Children. *See* No Brief Letter, 12/7/23.

While Mother indicated her assent to the voluntary termination of her parental rights, the court proceeded with the hearing and held its decision in abeyance in order to allow Mother time to execute consents. *See* N.T., 6/20/23, at 4-6, 36-37. ("I can hear testimony and hold it in abeyance. So, that'll give her a chance to [sign consents for voluntary termination], but I don't want to defer hearing the testimony if there's no issues as to notice of today's hearing, but I'm willing to hold a decision in abeyance. . . ."). Mother stipulated to the allegations set forth in the petitions. *See id.* at 5-6. In addition, the Agency presented the testimony of Mr. Burgos. At the conclusion of the hearing, the court relisted the matter for August 23, 2023, in order to allow time for maturation. *See id.* at 37-38.

Thereafter, it follows, Mother executed consents for the voluntary termination of her parental rights. DHS filed petitions for voluntary termination and to confirm Mother's consent on July 5, 2023.

On August 23, 2023, Mother, however, revoked her consents,[6] *see* N.T., 8/23/23, at 5, and DHS's petitions with respect to the voluntary termination of her parental rights were withdrawn. As such, the trial court heard argument with regard to DHS's goal change petitions and petitions to involuntarily terminate Mother's parental rights. *See id.* at 8-12.

---

[6] The court accepted an offer of proof that Mother wished to revoke her consents for voluntary termination and would testify that she felt "compelled" to execute same, resulting in the inability to confirm same. *See* N.T., 8/23/23, at 6-7.

By decrees dated and entered August 23, 2023, the trial court involuntarily terminated Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). Further, by orders also dated and entered August 23, 2023, the court changed the Children's permanency goals from reunification to adoption.

Mother, through Attorney Server, timely filed separate notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), on September 20, 2023, which this Court consolidated *sua sponte*.[7] On December 3, 2023, Attorney Server filed a petition to withdraw, as well as an **Anders** brief. Accordingly, we will begin our review by considering the validity and propriety of Attorney Server's submissions pursuant to **Anders**. **See In re Adoption of M.C.F.**, 230 A.3d 1217, 1219 (Pa. Super. 2020) (quoting **Commonwealth v. Daniels**, 999 A.2d 590, 593 (Pa. Super. 2010)) ("'When presented with an **Anders** brief, this court may not review the merits of the underlying issues without first passing on the request to withdraw.'").

---

[7] On October 27, 2023, the trial court filed a Notice of Compliance with Rule of Appellate Procedure 1925(a), in which it references its reasoning placed on the record. **See** N.T., 8/23/23, at 12-17.

When counsel seeks to withdraw pursuant to *Anders* and its progeny,[8]

they must:

> 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the [*Anders*] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.

*Commonwealth v. Cartrette*, 83 A.3d 1030, 1032 (Pa. Super. 2013) (*en banc*) (citation omitted). Counsel must also "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights." *Commonwealth v. Millisock*, 873 A.2d 748, 752 (Pa. Super. 2005).

Additionally, our Supreme Court has set forth the following requirements for *Anders* briefs:

> [W]e hold that in the *Anders* brief that accompanies court-appointed counsel's petition to withdraw, counsel must: (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Santiago*, 78 A.2d at 361.

---

[8] This Court extended the *Anders* procedure to appeals from decrees terminating parental rights involuntarily in *In re V.E.*, 611 A.2d 1267, 1275 (Pa. Super. 1992). This Court further extended the *Anders* principles to appeals involving goal change orders in *In re J.D.H.*, 171 A.3d 903, 906 (Pa. Super. 2017).

Instantly, Attorney Server filed a petition to withdraw certifying his conscientious review of the record and determination that Mother's appeals are frivolous. He further attached copies of a **Millisock** letter informing Mother of her rights. Likewise, Attorney Server has filed an **Anders** brief that substantially complies with the requirements set forth in **Santiago**, **supra**.[9], [10]

Having concluded that Attorney Server complied with the procedural requirements of **Anders**/**Santiago**, we must next "conduct a review of the record to ascertain if on its face, there are non-frivolous issues that counsel, intentionally or not, missed or misstated." **Commonwealth v. Yorgey**, 188 A.3d 1190, 1197 (Pa. Super. 2018) (*en banc*).

Attorney Server's **Anders** brief raises the following issue for our review: "Whether the trial court abused its discretion by involuntarily terminating the Mother's parental rights under sections 2511 (a)(1), (2), (5), (8), and (b)?" (cleaned up). **Anders** Brief at 6.

Our standard of review in this context is well-established:

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent

---

[9] While we observe Attorney Server's failure to cite to the certified record, we remain cognizant that the framework of **Anders** and **Santiago** require substantial, not perfect performance. **See Commonwealth v. Wrecks**, 934 A.2d 1287, 1290 (Pa. Super. 2007); **see also Commonwealth v. Redmond**, 273 A.3d 1247, 1252 (Pa. Super. 2022).

[10] Mother has not responded to Attorney Server's petition to withdraw and **Anders** brief.

evidence. When applying this standard, the appellate court must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record. Where the orphans' court's factual findings are supported by the evidence, an appellate court may not disturb the orphans' court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, the orphans' court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (cleaned up).

The involuntary termination of parental rights is governed at statute by section 2511 of the Adoption Act, which requires a bifurcated analysis. *See* 23 Pa.C.S.A. § 2511. The trial court must initially determine whether the conduct of the parent warrants termination under one of the eleven enumerated grounds set forth at section 2511(a). Only if the court determines that the petitioner has established grounds for termination under section 2511(a) does it then engage in assessing the petition under section

2511(b), which focuses upon the child's needs and welfare. **See In re T.S.M.**, 602 Pa. 602, 628, 71 A.3d 251, 267 (2013). To involuntarily terminate parental rights, the petitioner must satisfy both section 2511(a) and (b) by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." **In re Adoption of C.M.**, 255 A.3d 343, 359 (Pa. 2021).

In the case *sub judice*, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (4), (5), (8), and (b). To affirm the underlying decrees, however, we need only agree with the court's decision as to any one subsection of section 2511(a), along with section 2511(b). **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). As such, we limit our discussion to section 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare

- 11 -

of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

To prove the applicability of subsection (a)(2), the party petitioning for termination must establish: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot and will not be remedied. **See In re Adoption of A.H.**, 247 A.3d 439, 443 (Pa. Super. 2021). Subsection (a)(2) emphasizes the child's present and future needs, not the parent's refusal to perform their duties and thus "should not be read to compel courts to ignore a child's need for a stable home and strong continuous parental ties. . . . **This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it**." **In re Z.P.**, 994 A.2d 1108, 1117 (Pa. Super. 2010) (citation omitted) (emphasis in original). Section 2511(a)(2) grounds are not limited to affirmative misconduct; they may also include acts of refusal and incapacity to perform parental duties. **See In re S.C.**, 247 A.3d 1097, 1104 (Pa. Super. 2021), *abrogated on other grounds by* **Interest of K.T.**, 296 A.3d

1085, 1110 n.23 (Pa. 2023). We have long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *See In re M.A.B.*, 166 A.3d 434, 443 (Pa. Super. 2017).

In concluding that DHS established the statutory grounds to terminate Mother's parental rights pursuant to section 2511(a)(2), the trial court emphasized Mother's persistent substance abuse and lack of completion of treatment. The court stated as follows:

> The[ C]hildren were taken at the time that they were born. And they were born with drugs in their system. There has been no indication that Mom has been able to remedy the situation which led the [C]hildren coming into care.
>
> She's not successfully completed any drug and alcohol treatment. She's not consistently provided this [c]ourt with negative screens or shown at any additional time would remedy that situation[, a]s this case has been more than two years since the adjudication. And Mom has not demonstrated an ability to correct the situation which led to the [C]hildren coming into care.

N.T., 8/23/23, at 14.

A review of the record supports the trial court's finding of grounds for termination under section 2511(a)(2). Significantly, the record reveals a history of substance abuse that persisted and remained untreated. At the time of the Children's birth in March 2021, both Mother and the Children tested positive for illegal substances leading to the Children's placement following their discharge from the hospital after an extended stay in the neonatal intensive care unit. Notwithstanding multiple court orders and/or permanency

objectives related to forthwith and random drug screening and substance abuse treatment, Mother tested positive for marijuana and amphetamines as recently as March 21, 2023, upon presentation to the Clinical Evaluation Unit ("CEU")[11] for a forthwith drug and alcohol screening following a court hearing. *See* N.T., 6/20/23, at 18; DHS Exhibit 7 (Urine Drug Testing Report). Mr. Burgos confirmed no prescription for amphetamines and indicated no knowledge of a medical marijuana card. *See* N.T., 6/20/23, at 31-32. He testified that this was the first time Mother had presented to the CEU since July 2021, noting her lack of compliance with drug screening throughout the pendency of the Children's dependency.[12] *See id.* at 17; *see also id.* at 19, 32. Notably, he expressed concern at this positive result "[b]ecause this is the reason that the case came in, . . . her substance abuse." *Id.* at 18.

Mr. Burgos further acknowledged Mother's lack of engagement in substance abuse treatment. While recognizing Mother's past involvement in a Suboxone treatment program, he explained this was inadequate. Mr. Burgos testified as follows:

> [COUNSEL FOR DHS]: Does she actively engaged in any drug and alcohol program at this time?

---

[11] It appears that this unit is now known as the Substance Analysis Unit. *See* DHS Exhibit 7 (Urine Drug Testing Report).

[12] Although random drug screens were likely performed in connection with Mother's participation in a Suboxone program, Mr. Burgos stated that he had no documentation related thereto. *See* N.T., 6/20/23, at 33.

MR. BURGOS: Not to my knowledge.

[COUNSEL FOR DHS]: And she has previously been engaged -- or receiving Suboxone from Einstein; is that correct?

MR. BURGOS: Correct.

[COUNSEL FOR DHS]: And why is that not sufficient for drug and alcohol treatment?

MR. BURGOS: Because anybody can get Suboxone treatment. You don't specifically need to have a drug and alcohol assessment.

[COUNSEL FOR DHS]: And, to your knowledge, has she had a drug and alcohol assessment?

MR. BURGOS: Not by any proof that's been provided.

[COUNSEL FOR DHS]: And has she provided you any documentation of successful engagement or treatment in a drug and alcohol program since you've been case manager?

MR. BURGOS: No.

*Id.* at 18-19.  Mr. Burgos therefore confirmed that reunification posed the potential for risk to the Children.  *See id.* at 19.

Moreover, Mr. Burgos testified that he had no documentation and was unable to verify Mother's participation in domestic violence services.  *See id.* at 19-21.  He stated that, based upon the one occasion he was able to assess Mother's residence,[13] she did not have housing appropriate for the Children as there was no place for Children to sleep.  *See id.* at 22-23.  She also failed to

_____

[13] Despite multiple attempts, Mr. Burgos was unable to assess Mother's home again.  He stated, "Either she wouldn't be home or the times that I would try to (unintelligible) come do the assessment, she would not be available because of work."  *Id.* at 22.

- 15 -

provide a copy of a lease. *See id.* at 31. Additionally, Mother had not provided proof of current employment. *See id.* at 23, 31. As such, Mr. Burgos opined that the Children could not be safely returned to Mother's care, and reunification was not possible. *See id.* at 24.

Given this enduring, unresolved behavior, it is entirely speculative when and if Mother will be in a position to care for the Children and provide them with safety and stability. This prospect is simply unacceptable for the Children, who at the time of the termination hearing, had been in care for two years, their entire lives.

Based on the foregoing, we discern no abuse of discretion by the court in concluding that termination pursuant to section 2511(a)(2) is warranted. The record demonstrates that Mother's repeated and continued incapacity due to ongoing substance abuse, unresolved domestic violence issues, and lack of appropriate housing and employment, has caused the Children to be without essential parental care, control, or subsistence necessary for their physical or mental well-being. Further, the conditions and causes of Mother's incapacity cannot or will not be remedied. *See A.H.*, 247 A.3d at 443. As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

Having found sufficient grounds for termination pursuant to section 2511(a)(2), we next must determine whether termination was proper under section 2511(b), which affords "primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). "[T]he determination of the child's 'needs and welfare' requires consideration of the emotional bonds between the parent and child. The 'utmost attention' should be paid to discerning the effect on the child of permanently severing the parental bond." *See T.S.M.*, 620 Pa. at 628, 71 A.3d at 267 (internal citations omitted). As our Supreme Court recently explained in *Interest of K.T.*, 296 A.3d 1085, 1113 (Pa. 2023):

> [A] court conducting a Section 2511(b) analysis **must consider more than proof of an adverse or detrimental impact** from severance of the parental bond. We emphasize analysis of the parental bond is but one part of the overall subsection (b) analysis, which includes a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare.

*K.T., supra* (emphasis added).

The evaluation of a child's respective bonds is not always an easy task. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted).

In addition, the **K.T.** Court held that the "Section 2511(b) inquiry must also include consideration of other important factors." **Id.** While not inventing an exhaustive list of considerations, the Court explained that the inquiry **must consider and weigh** certain evidence **if it is present in the record**, including, but not limited, "the child's need for permanency and the length of time in foster care [. . .]; whether the child is in a pre[-]adoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability." **Id.** (footnote omitted); **see also id.** at n.28 (emphasis in original).

Instantly, in determining that termination was additionally proper under section 2511(b), the trial court found that the Children did not share a parent-child bond with Mother, but instead shared such a bond with their foster mother. The court stated as follows:

> With regards to [section 2511(b)], there is no parent/child bond between [the Children] and their mother. They may know their mother or recognize her through these supervised visits that occurred since their birth[,] but they do not know her as their mother. The only figure that they know as their mother has been their resource family in this case. And I don't find that there is a parent[-]child bond and that these children would suffer irreparable harm if Mother's rights were terminated.

N.T., 8/23/23, at 16-17. We discern no abuse of discretion.

At the time of the subject proceeding, the Children, who were two years old, had resided in their medical foster home their entire lives. **See** N.T., 6/20/23, at 9-10. Mr. Burgos testified that the Children look to their foster

mother, who was a pre-adoptive resource, for all of their needs, including medical and financial. He confirmed that it is their foster mother they seek when they are sick, hungry, or hurt. *See id.* at 28-29.

While Mother engaged in weekly visitation with the Children, Mr. Burgos confirmed that such visitation remained supervised. *See id.* at 13. He recounted instances of missed visits throughout the pendency of the case, noting that Mother's visitation was cancelled on two occasions due to her missing three consecutive visitations. *See id.* at 14-16. He further reported a gap in visitation from January 17, 2023, when Mother had her last visitation with the Children through Family School, until late March when referred for supervised visitation at the agency.[14] *See id.* at 33-34.

Notably, Mother had also missed several visits prior to the subject hearing. *See id.* at 14; *see also* DHS Exhibit 6 (CUA Supervised Visitation Program No Visit Notification Forms). Mr. Burgos described that at the last visit a month prior, "As soon and the foster mom dropped off both children, they began crying. They were actually screaming." *Id.* at 15. And when she returns, "They run towards her and call her mom." *Id.* Conversely, he observed no issues separating from Mother. *Id.*

---

[14] Mr. Burgos testified to Mother's lack of outreach as to the Children's well-being and failure to attend their medical appointments despite notification. *See* N.T., 6/20/23, at 16-17.

As such, Mr. Burgos opined that a parent-child bond did not exist between Mother and the Children. He testified as follows:

[COUNSEL FOR DHS]: All right. And how are the [C]hildren doing in the pla-- actually, do you believe there's a parent-child relationship between [D.H.] and [Mother], such that [D.H.] looks to her to fulfill all of the daily parental needs?

MR. BURGOS: I believe that she's familiar with who [Mother] is, but not for any paternal or maternal support.

[COUNSEL FOR DHS]: And, essentially, [Mother] is just a visitation resource for [D.H.]?

MR. BURGOS: Yes.

[COUNSEL FOR DHS]: Would you say the same thing for [R.H.]?

MR. BURGOS: Yes.

*Id.* at 26.

Mr. Burgos further indicated that the Children would not suffer irreparable harm if Mother's parental rights were terminated. He explained, "This case has been open for two years now, and the [C]hildren have been raised by the foster parents since they were born." *Id.* at 24. In fact, as their foster mother provides the Children much needed stability, Mr. Burgos stated that the Children would suffer harm if removed from the foster home. *See id.* at 27-28.

Based on the foregoing independent analysis of the trial court's termination of Mother's parental rights, we agree with Attorney Server that the appeals from the decrees terminating Mother's parental rights pursuant to

section 2511(a)(2) and (b) are wholly frivolous and our review of the record does not reveal any overlooked non-frivolous issues.

Given our disposition concerning termination, Mother's appeals from the goal change orders are moot.[15] *See Int. of A.M.*, 256 A.3d 1263, 1272-1273 (Pa. Super. 2021) (finding issues regarding goal change moot in light of termination of parental rights); *A.H.*, 247 A.3d at 446 ("the effect of our decision to affirm the orphans' court's termination decree necessarily renders moot the dependency court's decision to change Child's goal to adoption"); *see also In re D.K.W.*, 415 A.2d 69, 73 (Pa. 1980) (stating that once parental rights are terminated, issues of custody and dependency under the Juvenile Act are moot).

For the foregoing reasons, we grant Attorney Server's petition to withdraw. We affirm the termination decrees and dismiss the goal change orders as moot.

Counsel's petition to withdraw granted. Decrees affirmed. Appeals from goal change orders dismissed.

---

[15] Even if not moot, for the reasons we have already discussed throughout this memorandum with respect to termination, the record confirms that changing the Children's respective permanency goals to adoption is in their best interest. *See In re A.B.*, 19 A.3d 1084, 1088-1089 (Pa. Super. 2011).

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/15/2024